**IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON**

STATE OF WASHINGTON,

               Respondent,

      v.

COREY DAMON MONTGOMERY,

               Appellant.

No. 83517-3-I

DIVISION ONE

UNPUBLISHED OPINION

       MANN, J. — Corey Montgomery was convicted on multiple charges related to two domestic violence incidents with his girlfriend, M.C. Montgomery appeals his convictions for assault in the second degree, domestic violence (count 1), domestic violence felony assault in the fourth degree (count 2), domestic violence felony violation of a court order (count 4), and assault of a child in the third degree (count 5). First, Montgomery argues his convictions on counts 1 and 2 violate double jeopardy. The State concedes that count 2 should be vacated. Second, Montgomery argues that his conviction on count 4 should be vacated because the State failed to prove all elements of the crime and the information omitted an essential element of the crime. The State concedes that count 4 should be vacated. Montgomery also argues there was

insufficient evidence to convict him on count 5. We disagree. Montgomery raises additional claims challenging his convictions in a statement of additional grounds (SAG). We accept the State's concessions and vacate counts 2 and 4 and remand for resentencing. We otherwise affirm.

I.

<u>November 25, 2019 Incident</u>

On November 25, 2019, Federal Way Police responded to a report of domestic violence at an apartment complex. When they arrived, maintenance staff, Jeremy Choppin, flagged the officers down. Choppin explained that he had been changing locks in the complex when he heard a child crying and yelling for help. Choppin saw the child who appeared scared and the child stated, "he's hurting my mom." Choppin then saw a woman in the window of the apartment, crying and holding herself. When Choppin asked if she was ok, the woman responded, "he laid his hands on me." Choppin persuaded the woman to come out of the window. Choppin saw a man leave the apartment and walk towards the manager's office.

The officers met with M.C. who was shaken and upset. M.C. reported that she was currently 21 weeks pregnant with Montgomery's child and that he was staying with her and her five-year-old son, I.B., a few nights a week. M.C. reported that Montgomery wanted to have sex that morning, while she did not, and he kept putting his hands inside her underwear. While M.C. was making breakfast for I.B., Montgomery followed her, poked her in the face, and pushed her in the chest. When M.C. pushed his hands away, Montgomery grabbed her by the neck with both hands, choking her. Montgomery continued to choke her for three to four minutes.

The officers observed scratches on M.C.'s lower neck and upper chest, light bruising and petechiae on her neck, and some neck swelling. M.C. was crying and sweating, and her face was red and flushed. M.C. told the officers she was scared, had difficulty swallowing, was dizzy, disoriented, and had neck pain.

South King Fire and Rescue responded and treated M.C. at the scene. Firefighter Tyler Wilkins observed what he identified as petechial hemorrhaging on M.C. that was consistent with strangulation.

As a result of this incident, Montgomery was charged with assault in the second degree, domestic violence (count 1), and domestic violence felony assault in the fourth degree (count 2). A no-contact order was put in place protecting M.C. from Montgomery.

### May 15, 2020 Incident

Unbeknownst to his case worker, and while on electronic home detention because of the November incident, Montgomery moved in with M.C., I.B., and their mutual child O.M.

On May 15, 2020, neighbors heard yelling, crying, and banging coming from inside M.C.'s apartment. Neighbors heard a child crying and yelling, "Get off my mama!" They also heard M.C. yelling, "why" and "why did you hit him." Multiple neighbors and the apartment manager called 911.

M.C. told the responding officer that afternoon Montgomery and M.C. were in an argument. Montgomery was in the kitchen making cannabis edibles. M.C. dropped a bag of Montgomery's cannabis and he grabbed her arm. When M.C. asked Montgomery to leave, he grabbed her with his right arm around her neck in a triangle

-3-

hold. They wrestled for about two minutes. Then, Montgomery flipped M.C. onto the ground and strangled her for about 20 seconds. Montgomery taunted M.C., asking, "Do you still want me to leave," and telling M.C. he would kill her. I.B., then six-years-old, ran up and tried to stop Montgomery from strangling M.C. Montgomery punched I.B. in the face.

M.C. exited the apartment with I.B. and O.M. Witnesses saw that I.B. was crying and that he had a gash on his forehead. M.C. was visibly upset and yelled, "No! You hit my child." M.C. got into Montgomery's car with the children. Montgomery exited the apartment with a bag, approached the car, and pulled on the door. When Montgomery put his hand in the open window, M.C. drove off. Montgomery hung onto the car as it sped around the parking lot, eventually falling off.

Federal Way Police Officers and South King Fire and Rescue arrived at the scene. Officer Dustin Connolly spoke with M.C. and observed M.C.'s demeanor as "in shock," meek, and very afraid. M.C.'s voice was scratchy and she kept bringing her hands to her throat. Officer Connolly saw "quite a substantial looking bump" on I.B.'s forehead.

M.C. reported to Fire Lieutenant Walter Hanks that she had neck pain and a headache, that she had been strangled for about 20 seconds, and briefly lost consciousness. Hanks observed marks and scratches around M.C.'s neck. I.B. had a small laceration on his forehead. I.B. told Hanks that he was punched by an adult male and had "a little bit of pain in his head."

I.B. was transported to St. Francis Hospital and treated by Dr. Andrea Drenguis. M.C. reported to Dr. Drenguis that I.B. had been struck in the head by his father with his

-4-

fist and that I.B. had a previous injury to his forehead from about six months before. Dr. Drenguis saw signs of a scar in the middle of I.B.'s forehead with the new injury in the same area. It appeared to Dr. Drenguis that the previous injury had re-opened. While I.B.'s prior injury was minor enough that a skin adhesive, dermabond, had been used to close the wound, the new injury was a "gaping wound" that could not be treated with dermabond alone. Dr. Drenguis used a suture and dermabond to repair I.B.'s wound. Dr. Drenguis described I.B.'s injury as consistent with blunt force trauma.

Meanwhile, Montgomery barricaded himself inside the apartment. Montgomery called M.C.'s mother, admitted that he had physically abused M.C., and told her that he had cut himself. M.C.'s mother called 911 to report what Montgomery had told her.

Valley SWAT team and crisis negotiator Officer Heather Castro responded to the scene. Castro contacted Montgomery. About 15 minutes after Castro began speaking with Montgomery, she, and other officers, noticed black smoke coming out of the apartment. The smoke became thicker and heavier causing firefighters and police to evacuate the building. When Castro asked Montgomery about the smoke, he told her he was smoking. Montgomery was coughing and indicated that he couldn't see because of the smoke. Montgomery finally exited through the sliding glass door where officers placed him in custody.

Montgomery was transported to the hospital because of self-inflicted injuries. At the scene and the hospital, Montgomery was combative towards officers, coughing in the face of one officer and calling her a "bitch," trying to kick another officer in the face, issuing threats, and spitting in a detective's face and eyes.

-5-

King County Fire Investigator Steven Crown investigated the cause of the fire. Based on his observations, Crown determined that the fire originated from a pile of clothes on the living room floor. Crown conducted several experiments to rule out possible causes of the fire. After those experiments, Crown concluded that the fire was an incendiary fire, that was intentionally started with an open flame in the living room.

Crown estimated $25,000 worth of damages to the apartment. The laminate floor in the living room was damaged, blistered, charred, and partially consumed, there was smoke and heat damage to the ceiling of the entire apartment building, the smoke alarm was damaged, and the exterior of the building was damaged. As a result, the apartment was deemed unsafe to occupy. Substantial repairs had to be made and it was two months before the apartment could be rented again.

As a result of the May incident, Montgomery was charged with assault in the second degree, domestic violence (count 3), domestic violence felony violation of a court order (count 4), assault of a child in the third degree (count 5), arson in the first degree (count 6), and assault in the third degree (count 7). Montgomery was also charged with tampering with a witness (count 8), and three counts of domestic violence misdemeanor violation of a court order (counts 9, 10, and 11).

Montgomery waived his right to a jury trial and agreed to consolidate the two cases. After a bench trial, Montgomery was convicted on all 11 counts. Montgomery appeals.

II.

A.

Montgomery argues his convictions on counts 1 and 2 violate double jeopardy. The State concedes that count 2 should be vacated. We accept the State's concession and vacate Montgomery's conviction for domestic violence felony assault in the fourth degree.[1]

The double jeopardy clauses of the state and federal constitutions protect against multiple punishments for the same offense. In re Pers. Restraint of Orange, 152 Wn.2d 795, 815, 100 P.3d 291 (2004). Whether multiple punishments constitute double jeopardy is a question of law reviewed de novo. State v. Daniels, 160 Wn.2d 256, 261, 156 P.3d 905 (2007).

To determine whether multiple convictions violate double jeopardy, we first look to the relevant statutes to determine whether the legislature intended the offenses to be the same. Orange, 152 Wn.2d at 815. If there is no explicit statement of legislative intent, "Washington courts apply a rule of statutory construction that has been variously termed the 'same elements' test, the 'same evidence' test, and the Blockburger test." Orange, 152 Wn.2d at 816 (citing Blockburger v. United States, 284 U.S. 299, 304, 52 S. Ct. 180, 76 L. Ed. 306 (1932)). Under this test, we determine whether one offense requires proof of an element that the other does not, either based on the statutory elements or the specific facts used to prove the elements in a specific case. Orange, 152 Wn.2d at 818-19. Double jeopardy may still be violated if both convictions relied on

---

[1] Montgomery also argues that the State failed to prove elements of felony assault in the fourth degree. Because the State concedes error on double jeopardy grounds, we do not address this argument.

-7-

proof of the same facts, even if the elements are facially different.  State v. Hughes, 166 Wn.2d 675, 683-84, 212 P.3d 558 (2009).

The legislature did not expressly authorize multiple punishments for second degree assault and felony fourth degree assault.  As a result, we apply the Blockburger analysis.  Assault in the second degree and felony assault in the fourth degree are not the same "in law."  Second degree assault requires proof of strangulation, which is not needed for fourth degree assault.  RCW 9A.36.021(1)(g); RCW 9A.36.041.  Likewise, felony fourth degree assault requires two or more prior domestic violence convictions; second degree assault does not.  RCW 9A.36.041(3); RCW 9A.36.021.

However, as the State correctly concedes, as pled and proven, Montgomery's conviction on counts 1 and 2 were based on the same May 15, 2019 conduct— Montgomery's strangulation of M.C.  Because the same act of strangulation was relied on for both convictions, a double jeopardy violation occurred.

The remedy for a violation of double jeopardy is to vacate "the crime carrying the lesser sentence."  State v. Weber, 127 Wn. App. 879, 888, 112 P.3d 1287 (2005).  Second degree assault, a class B felony, is more serious than felony fourth degree assault, a class C felony.  RCW 9A.36.021(2)(a); RCW 9A.36.041(3)(a).  Accordingly, we vacate Montgomery's conviction on count 2.

B.

Montgomery argues his conviction on count 4 should be vacated because the State failed to prove all elements of the crime and the information omitted an essential element of the crime of felony violation of a court order.  The State concedes that the

conviction should be vacated, however the State argues that a double jeopardy violation occurred. We accept the State's concession.

As discussed above, both the federal and state constitutions bar multiple punishments for the same offense. State v. Kelley, 168 Wn.2d 72, 76, 226 P.3d 773 (2010). But "[a] legislature can enact statutes imposing, in a single proceeding, cumulative punishments for the same conduct." Kelley, 168 Wn.2d at 77. The double jeopardy clause prevents the sentencing court from prescribing greater punishment than the legislature intended. Kelley, 168 Wn.2d at 77.

Under RCW 26.50.110(4):[2]

> any assault that is a violation of an order issued under this chapter . . . and that does not amount to assault in the first or second degree . . . is a class C felony, and any conduct in violation of such an order that is reckless and creates a substantial risk of death or serious physical injury to another person is a class C felony.

Our Supreme Court has twice held that if a defendant is charged and convicted of first or second degree assault, that conviction "'cannot serve as the predicate to make the violation [of an order] a felony.'" State v. Ward, 148 Wn.2d 803, 812, 64 P.3d 640 (2003) (quoting State v. Azpitarte, 140 Wn.2d 138, 141, 995 P.2d 31 (2000)). The Ward court explained:

> the purpose of the "does not amount to" provision is to elevate no-contact violations to a felony when any assault is committed. The legislature did not need to increase the penalty for first or second degree assault, since in their own right the crimes are class A and B felonies respectively.

---

[2] Ch. 26.50 RCW was repealed by LAWS OF 2021, ch. 215, § 170, effective July 1, 2022. Civil protection orders, including no-contact orders are now governed by ch. 7.105 RCW. Because this matter was considered under former ch. 26.50 RCW, citations will be to the former statute.

148 Wn. 2d at 812.  Under this statutory scheme, "all assault convictions connected to violation of a no-contact order will result in a felony, either through the assault itself or through the application of [RCW 26.50.110(4)]."  Ward, 148 Wn.2d at 812; Azpitarte, 140 Wn.2d at 142.

In this case, the trial court concluded that on May 15, Montgomery intentionally assaulted M.C. by strangulation, thus committing assault in the second degree.  The trial court's conclusion of law for felony violation of a court order is as follows:

1. On or about May 15, 2020, there existed a No-contact Order applicable to Mr. Montgomery;
2. That Mr. Montgomery knew of the existence of this order;
3. That on or about May 15, 2020, Mr. Montgomery knowingly violated a provision of this order;
4. That Mr. Montgomery's conduct was an assault and did not amount to assault 1 or 2;* or Mr. Montgomery's conduct was reckless and created a substantial risk of death or serious physical injury to another person; and
5. Mr. Montgomery's act occurred in the State of Washington.
6. *As stated in the Findings of Fact, in reaching this Conclusion of Law, the court finds beyond a reasonable doubt on May 15, 2020, Mr. Montgomery assaulted [M.C.] by way of grabbing around the neck in a triangle hold.  See, Finding of Fact 2.g.i.  The court finds this was a separate act from when he then flipped her on the ground and began strangling her.  See, Finding of Fact 2.g.ii.-iv.

While the court found that these were separate acts, the same acts supported the conclusion that Montgomery intentionally assaulted M.C. by strangulation.  And both acts occurred during a two-minute struggle between Montgomery and M.C.  The legislature's language is clear that if a defendant is charged and convicted under RCW 9A.36.021, the statute proscribes the use of that conviction to enhance a no-contact violation to a felony.  Ward, 148 Wn.2d at 810-11.  Thus, because the assault itself

resulted in a felony conviction, it was error to convict Montgomery for felony violation of a court order.  See Ward, 148 Wn.2d at 812.

Accordingly, we vacate the conviction on count 4 for felony violation of a court order.

C.

Montgomery contends the State failed to prove the elements of assault of a child in the third degree because the evidence was insufficient to demonstrate that I.B. suffered substantial pain and considerable suffering.  We disagree.

Due process of law requires that the State prove every element of a charged crime beyond a reasonable doubt to obtain a criminal conviction.  State v. O'Hara, 167 Wn.2d 91, 105, 217 P.3d 756 (2009).  Because the sufficiency of the evidence is a question of law, we review this issue de novo.  State v. Rich, 184 Wn.2d 897, 903, 365 P.3d 746 (2016).

"The critical inquiry on review of the sufficiency of the evidence to support a criminal conviction must be . . . to determine whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt."  Jackson v. Virginia, 443 U.S. 307, 318, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979).  The question is whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Jackson, 443 U.S. at 319; State v. Salinas, 119 Wn.2d 192, 829 P.2d 1068 (1992).  On review, the court defers to the trier of fact on issues of conflicting testimony, credibility of witnesses, and the persuasiveness of the evidence.  State v. Killingsworth, 166 Wn. App. 283, 287, 269 P.3d 1064 (2012).  The appellate court does not "reweigh the

evidence and substitute [its] judgment for that of" the fact finder.  State v. McCreven, 170 Wn. App. 444, 477, 284 P.3d 793 (2012).

The State charged Montgomery with third degree assault of a child.  Under RCW 9A.36.140, a person is guilty of assault of a child in the third degree if the person commits third degree assault against a person under the age of 13.  A person commits third degree assault if the person "causes bodily harm accompanied by substantial pain that extends for a period sufficient to cause considerable suffering."  RCW 9A.36.031(1)(f).

"Bodily harm" is defined as physical pain or injury, illness, or an impairment of physical condition.  RCW 9A.04.110(4)(a).  The statute does not define "substantial pain" but in State v. McKague, 172 Wn.2d 802, 262 P.3d 1225 (2011), the Supreme Court held that "substantial" "signifies a degree of harm that is considerable and necessarily requires a showing greater than an injury merely having some existence." "[B]y requiring that the pain must last long enough to cause 'considerable suffering,'" the legislature indicated a durational requirement.  State v. Loos, 14 Wn. App. 2d 748, 766, 473 P.3d 1229 (2020).  "The State must demonstrate that the amount of pain the victim experienced was considerable and the pain the victim experienced lasted for a significant period of time."  Loos, 14 Wn. App. 2d at 766.

In past cases, this court has concluded that evidence of substantial pain and considerable suffering was sufficient where the State proved that the victim suffered a headache that lasted more than two weeks, extensive bruising, and a black eye.  State v. Robertson, 88 Wn. App. 836, 841, 947 P.2d 765 (1997).  In State v. Fry, the evidence was sufficient where the State proved the victim suffered a swollen face and right eye,

and pain in the face lasting through the morning after being punched. 153 Wn. App. 235, 241, 220 P.3d 1245 (2009). In State v. Saunders, the evidence was sufficient where the State proved the victim suffered neck pain lasting more than three hours, swelling on her cheek, and an abrasion on her forehead. 132 Wn. App. 592, 600, 132 P.3d 743 (2006).

In contrast, in Loos, the evidence was insufficient when a babysitter submerged a toddler in her care in water and he came up coughing and screaming. 14 Wn. App. 2d at 754. While the evidence was sufficient to establish that the child's coughing when pulled out of the water caused some physical pain, there was no evidence that the child remained in pain once the child eliminated water from his throat. Loos, 14 Wn. App. 2d at 767.

Here, a rational trier of fact could conclude beyond a reasonable doubt that Montgomery caused I.B. substantial pain and considerable suffering because there was evidence that I.B. cried and complained of pain in the face, the punch caused a gaping wound consistent with blunt force trauma, it re-opened a healing injury on I.B.'s forehead, the injury required I.B. to be transported to the hospital, and required a suture, using needles, to close the wound. Montgomery's sufficiency claim fails.

D.

Under RAP 10.10, a defendant may submit a pro se statement of additional grounds for review. "Our review of such statements, however, is subject to several practical limitations." State v. Calvin, 176 Wn. App. 1, 26, 316 P.3d 496 (2013). For example, we will not consider arguments made in a statement of additional grounds that do not inform the court of the nature and occurrence of the alleged errors. State v.

Alvarado, 164 Wn.2d 556, 569, 192 P.3d 345 (2008). And we only consider arguments that have not been adequately addressed by defendant's counsel. RAP 10.10(a). Montgomery raises two more issues in his statement of additional grounds.[3]

Montgomery first asserts that the State failed to prove the elements of arson in the first degree because the evidence was insufficient to demonstrate that Montgomery acted knowingly and maliciously.[4] Second, Montgomery asserts that his trial counsel provided ineffective assistance by not presenting evidence of his mental health issues. Neither argument is persuasive.

1.

To convict Montgomery of arson in the first degree as charged here, the State had to present evidence sufficient to prove beyond a reasonable doubt that he (1) knowingly and maliciously (2) caused a fire (3) that damaged a dwelling. RCW 9A.48.020(1)(a), (b). Under RCW 9A.04.110(12), "malice" is defined as "an evil intent, wish, or design to vex, annoy, or injure another person." "Malice may be inferred from an act done in willful disregard of the rights of another, or an act wrongfully done without just cause or excuse." RCW 9A.04.110(12). We infer malice when the State provides circumstantial evidence that a defendant intentionally caused a fire. State v. Clark, 78 Wn. App. 471, 481, 898 P.2d 854 (1995).

---

[3] Montgomery submitted a statement of additional authority with a statement of additional grounds dated November 9, 2022. Because the submission was untimely, we do not address the arguments in that new statement.

[4] In his statement of additional grounds, Montgomery also argues there was insufficient evidence of arson in the first degree because the fire was not manifestly dangerous to human life nor was another human in the building at the time. See RCW 9A.48.020(1)(a), (c). Because the trial court found that Montgomery knowingly caused a fire which damaged a dwelling and the evidence was sufficient to support this finding, we do not address Montgomery's alternate arguments.

The State presented circumstantial evidence that Montgomery intentionally set a fire in M.C.'s apartment. Montgomery was the only person in the apartment at the time of the fire. Fire Investigator Crown determined that the origin of the fire was a pile of clothing on the floor of the living room. Crown found a bottle of cooking oil and isopropyl alcohol in the living room. The fire alarm was found disconnected and on the floor. There was smoke damage across the entire unit, and heat and fire damage to the furniture and floors. Crown estimated that the fire caused $25,000 in damages. Crown determined that the cause of the fire was open flame ignition, an incendiary fire that was intentionally started for an illegal or reckless manner.

Taken together, and viewed in a light most favorable to the State, any trier of fact could reasonably infer that Montgomery knowingly started the fire. Montgomery's sufficiency claim fails.

2.

Montgomery contends that his defense counsel was ineffective because he did not pursue a diminished capacity defense and he did not request an exceptional mitigated sentence based on Montgomery's mental condition at the time of the offenses.

The Sixth Amendment to the United States Constitution and article I, section 22 of the Washington Constitution guarantee criminal defendants the right to effective assistance of counsel.

> To demonstrate ineffective assistance of counsel, a defendant must make two showings: (1) defense counsel's representation was deficient, i.e., it fell below an objective standard of reasonableness based on consideration of all the circumstances; and (2) defense counsel's deficient representation prejudiced the defendant, i.e., there is a reasonable probability that, except for counsels unprofessional errors, the result of the proceeding would have been different.

-15-

State v. McFarland, 127 Wn.2d 322, 334-35, 899 P.2d 1251 (1995). Representation is deficient if, after considering all the circumstances, counsel's performance falls below an objective standard of reasonableness. State v. Estes, 193 Wn. App. 479, 488, 372 P.3d 163 (2016), aff'd, 188 Wn.2d 450, 395 P.3d 1045 (2017). And prejudice exists "if there is a reasonable probability that except for counsel's errors, the result of the proceeding would have differed." Estes, 193 Wn. App. at 488 (citing State v. Grier, 171 Wn.2d 17, 34, 246 P.3d 1260 (2011)).

Courts engage in a strong presumption that representation was effective. State v. Brett, 126 Wn.2d 136, 198, 892 P.2d 29 (1995). The presumption may be rebutted where there is an "'absence of legitimate strategic or tactical reasons supporting the challenged conduct by counsel.'" State v. Crawford, 159 Wn.2d 86, 98, 147 P.3d 1288 (2006) (quoting McFarland, 127 Wn.2d at 336). "'[A]n attorney's ignorance of a point of law that is fundamental to his case combined with his failure to perform basic research on that point is a quintessential example of unreasonable performance.'" In re Pers. Restraint of Tsai, 183 Wn.2d 91, 102, 351 P.3d 138 (2015) (quoting Hinton v. Alabama, 571 U.S. 263, 134 S. Ct. 1081, 188 L. Ed. 2d 1 (2014)). But failure to object where that objection would not have been sustained is not ineffective assistance of counsel. See State v. Johnston, 143 Wn. App. 1, 19, 177 P.3d 1127 (2007). A claim of ineffective assistance of counsel is a mixed question of law and fact that we review de novo. State v. Sutherby, 165 Wn.2d 870, 883, 204 P.3d 916 (2009).

Montgomery's ineffective assistance of counsel claim fails because he cannot show deficient performance. First, the record shows that Montgomery made the decision to forgo a diminished capacity defense and, instead, pursue a general denial

defense. This decision could be viewed as a legitimate trial tactic. Second, defense counsel did present evidence of Montgomery's mental health issues by presenting a presentence motion that recommended sentencing Montgomery under the Mental Health Sentencing Alternative Act or, in the alternative, imposing an exceptional sentence below the standard range. RCW 9.94A.695. The trial court considered defense counsel's recommendations but decided not to follow them. The trial court found that this was not a compelling case to apply the mental health alternative. Thus, Montgomery's claim fails.

We accept the State's concessions and vacate the convictions for domestic violence felony assault in the fourth degree in count 2, and domestic violence felony violation of a court order in count 4 and remand for resentencing. We otherwise affirm.

_Mann, J._

WE CONCUR:

_Chung, J._

_Dwyer, J._